# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDRE JACKSON**, | |
| Plaintiff, | |
| v. | Case No. 23-cv-922 (CRC) |
| **DISTRICT OF COLUMBIA, *et al.*,** | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Andre Jackson has brought suit against the District of Columbia and two Metropolitan Police Department ("MPD") officers for his allegedly unlawful arrest in the spring of 2022. Jackson maintains that he was standing on a sidewalk when MPD Officers Donald Green and Afam Ishakwue (the "Officers") illegally arrested him based on the erroneous, and possibly pretextual, ground that he had fled from the scene of a purported traffic incident two nights prior. Jackson responded by filing the present action, alleging a host of constitutional and common law claims against the Officers as well as tort claims against the District, directly based on negligent supervision and vicariously under the doctrine of *respondeat superior*.

The District and MPD Officers now move to dismiss six of Jackson's eight claims under Federal Rule of Civil Procedure 12(b)(6). The Court finds Defendants are half right, as three of the six challenged charges currently fail to state a claim. In particular, the Court finds Jackson has met his burden of plausibly alleging constitutional and common law false arrest claims and in asserting that these violations may have resulted from the District's negligent supervision of MPD "jump-out" tactics. By contrast, the Court concludes that the three "alternative" counts in the complaint cannot proceed as alleged. First, Jackson's negligence and the negligent infliction of emotional distress claims are not separate and distinct from his intentional tort claims because

Jackson does not allege a violation of any legal duty beyond the prohibition on arresting without probable cause. Accordingly, these two claims must be dismissed pursuant to D.C. law. Second, Jackson's claim that the Officers violated his Fifth Amendment right to substantive due process similarly merges with his false arrest claims. To the extent his Fifth Amendment claim reaches beyond the justification for his arrest to challenge the manner in which it was effectuated, such a challenge to the reasonableness of police conduct during an arrest must be brought under the Fourth Amendment. The Court will therefore grant the motions to dismiss as to these three claims. However, it will afford Jackson an opportunity to amend his complaint to cure these current deficiencies should he choose to do so.

## I.    Background

The Court draws the following background from Jackson's complaint. Defendants no doubt contest many of his allegations.

On an early April evening in 2022, Jackson alleges that he was calmly leaning against a car and chatting with some friends on a sidewalk outside of the Park Morton Apartments when Officers Green and Ishakwue "jumped out of their patrol car and made their way towards him." Compl. ¶¶ 17–19. Jackson claims he "was wearing a face covering to protect his face from the elements, making only his eyes, eyebrows, and forehead visible." Id. ¶ 21. The MPD Officers nonetheless acted as if they recognized him, cryptically proclaiming that he was "driving the car the other day." Id. ¶ 23. As they approached, Jackson maintains that he did not move away or otherwise attempt to evade the Officers. Id. ¶ 24.

The situation soon escalated when, seconds later, Officer Ishakwue allegedly asked Jackson for identification while Officer Green "simultaneously began reaching for the front pocket of Mr. Jackson's hoodie." Id. ¶ 25. Again, Jackson claims he did not move or resist the

Officers in any manner as Green "grabbed the pocket of his hoodie." Id. ¶ 26. Jackson instead insists that he stood still and asked, "What are you touching me for?" Id. ¶ 27. Before Jackson had finished his question, he claims that Officer Green instructed Officer Ishakwue to handcuff him. Id. ¶ 28. Ishakwue complied and began placing Jackson in handcuffs. Id. ¶ 29. At this point, Jackson tells a somewhat conflicting tale of his response. In one paragraph, the complaint states that he "remained calm and stationary" as the Officers slapped the handcuffs around his wrists while he asked them why he was being arrested and professed his innocence. Id. ¶ 30–33. Several lines later, however, Jackson reports that he "feared for his safety" when the officers started to handcuff him, causing him to "tense up, pull away, and bring his hands toward his body." Id. ¶ 35.

Officer Green and an unknown officer then allegedly pinned Jackson against the vehicle that he had been leaning against as they approached. Id. ¶ 36. When Jackson later attempted to call his parole officer, the Officers confiscated his phone. Id. ¶¶ 37–38. Several other officers soon reported to the scene and, for some unknown reason, purportedly began roughing up the already detained Jackson. Id. ¶¶ 39–48. Jackson claims that four MPD officers grabbed his body and twisted his arm in an unnatural angle, causing him to cry out in pain. Id. ¶¶ 41–44. After Jackson continued asserting his innocence and requested a supervisory officer, id. ¶ 45, he contends that Officer Green "repeatedly and unjustifiably groped [his] genitals while [he] was handcuffed," id. ¶ 47. As a result, Jackson alleges that he had scratches all over his body and had to be transported to a hospital for treatment to his wrists and arms. Id. ¶ 48. Jackson was also taken into custody and held for 24 hours before being released. Id. ¶ 63. His arrest was eventually "no papered," however, meaning the prosecution decided not to proceed with any charges against him. Id.

In his initial arrest report, Jackson was cited for two offenses: "fleeing a law enforcement officer" and "resisting arrest."  Id. ¶ 49.  The flight charge allegedly stemmed from a traffic stop involving a white BMW that had occurred two nights before Jackson's arrest.  Id. ¶ 50.  Yet Jackson claims he does not own a white BMW (or know of anyone who does) and notes that the car he was leaning against on the day of his arrest was a gray Dodge Charger, not a white BMW. Id. ¶ 59.  Officer Green also left a traffic ticket for "driving the wrong way on a one way street" on the windshield of Jackson's grandmother's car, which was at the scene of the arrest, and jotted an incorrect badge number on the ticket.  Id. ¶¶ 59–62.  Jackson notes that his grandmother's car is also not a white BMW.  Id. ¶ 59.  The police report of the traffic incident states that it occurred around 6:05 p.m. two days prior on the 600 block of Lamont Street in the Northwest part of the District, but the monitoring device that Jackson is required to wear as a condition of his parole supposedly shows he was nowhere near that area during the relevant time period.  Id. ¶ 58.

Confounded by the Officers' seeming failure to perform a rudimentary investigation that would have exonerated him, Jackson surmises he may have been the target of an unlawful "jump-out."  Id. ¶ 3.  According to his complaint, "jump-outs" are a well-known phenomenon in the District consisting of "several MPD officers jumping out of their cars and seizing a civilian without probable cause."  Id.  Jackson claims that jump-outs typically take place in poor, Black neighborhoods and that the Park Morton Apartments, a D.C. Housing Authority property reserved for low-income residents, is a prime example of a target area.  Id.  The complaint also cites to a deposition from MPD Sergeant Charlotte Djossou's ongoing Whistleblower Act case in which Djossou has alleged that she informed higher ups in 2015 and again in 2018 that certain MPD units were performing jump-outs in poor neighborhoods to search and seize individuals

without probable cause.  Id. ¶ 4.  According to Djossou's complaint and subsequent deposition, her superiors retaliated against her for blowing the whistle and did not make any effort to counteract jump-outs.  Id. ¶ 6.

Jackson has filed suit against Officers Green and Ishakuwe as well as against the District, alleging a variety of constitutional and common law claims.  In all, his complaint contains eight counts: (1) a Fourth Amendment false arrest claim against the MPD Officers; (2) a common law false arrest claim against the Officers and against the District under the doctrine of *respondeat superior*; (3) assault and battery against Officer Green and against the District under *respondeat superior*; (4) intentional infliction of emotional distress against both Officers and against the District under *respondeat superior*; (5) negligent training, retention, and supervision against the District; (6) a common law negligence claim against both Officers and against the District under *respondeat superior* (in the alternative to Counts 1–3); (7) a Fifth Amendment substantive due process claim against both Officers (in the alternative to Count 1); and (8) negligent infliction of emotional distress against both Officers and against the District under *respondeat superior* (in the alternative to Count 4).  Both the District and the Officers responded by filing motions to dismiss.  Together, their two motions seek to toss out all claims except for Counts 3 and 4.

## II.   Legal Standard

To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual allegations, accepted as true, to "state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A claim is plausible on its face if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  A court evaluating a Rule 12(b)(6) motion will "construe the complaint 'liberally,' granting plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Barr

v. Clinton, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (quoting Kowal v. MCI Commc'ns Corp., 16

F.3d 1271, 1276 (D.C. Cir. 1994)).  However, a "court need not accept a plaintiff's legal

conclusions as true, . . . nor must a court presume the veracity of legal conclusions that are

couched as factual allegations."  Alemu v. Dep't of For-Hire Vehicles, 327 F. Supp. 3d 29, 40

(D.D.C. 2018) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2009)).

## III.  Analysis

In moving to dismiss six of Jackson's eight claims, Defendants miss the mark on half of

the counts but connect on the three "alternative" claims.  On the two false arrest claims, taking

the factual allegations as true and granting Jackson the benefit of all reasonable inferences, the

Court concludes that Jackson adequately alleged that the Officers lacked probable cause for the

arrest and finds it is currently unclear whether they are entitled to qualified immunity based on

this still sparse record.  While it is a closer call given the uncertainty as to whether (even as

alleged) Jackson's arrest fits the "jump-out" mold, Jackson also met his burden in alleging that

this purported false arrest may have stemmed from the District's failure to supervise officers and

curtail jump-out tactics.

Defendants fare better when it comes to Jackson's three "alternative" counts.  Regarding

Counts 6 and 8, these negligence theories of liability are not distinct from the alleged intentional

torts because they turn on a purported violation of the same legal duty not to arrest an individual

without probable cause.  As a result, these claims must be dismissed under D.C. law.  And with

respect to the Fifth Amendment due process claim, challenges to police conduct during an arrest

must be pleaded under the more particular constitutional provision: the Fourth Amendment.

A.  Counts 1 and 2: False Arrest

Starting with Counts 1 and 2, the District and the MPD Officers contend the complaint fails to state a claim of false arrest because it does not plausibly allege that the Officers lacked probable cause to arrest Jackson.  The Officers also contend that qualified immunity shields them from liability regardless.  Neither argument carries the day at this early stage of the case.

1.  *False Arrest Merits*

"Constitutional and common law claims of false arrest are generally analyzed as though they comprise a single cause of action."  Amobi v. D.C. Dep't of Corr., 755 F.3d 980, 989 (D.C. Cir. 2014).  That is because the elements of these two claims are "substantially identical."  Scott v. District of Columbia, 101 F.3d 748, 753 (D.C. Cir. 1996).  At their core, both turn on whether the officers had probable cause to arrest the plaintiff.  See Dingle v. District of Columbia, 571 F. Supp. 2d 87, 95 (D.D.C. 2008).[1]  Officers have probable cause if "at the moment the arrest was made, . . . the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect has committed or is committing a crime."  Smith v. United States, 843 F.3d 509, 515 (D.C. Cir. 2016) (citation and quotation marks omitted).  An arrest is not limited to custodial arrests; it includes any seizure of an individual beyond a mere investigatory stop. See, e.g., Hall v. District of Columbia, 867 F.3d 138, 153 (D.C. Cir. 2017); see also Tocker v. Great Atl. & Pac. Tea Co., 190 A.2d 822, 824 (D.C. 1963) (defining false imprisonment "as the

---

[1]  The one salient difference between these two causes of action is that while the Fourth Amendment inquiry turns entirely on the objective question of whether an officer had probable cause, see Taylor v. District of Columbia, 691 A.2d 121, 125 (D.C. 1997), D.C. tort law layers a subjective element on top of this objective analysis.  Specifically, an officer lacking probable cause may escape liability by demonstrating that he reasonably and in good faith believed that the arrest was lawful.  See District of Columbia v. Murphy, 631 A.2d 34, 36 (D.C. 1993).

unlawful detention of a person without a warrant or for any length of time whereby he is deprived of his personal liberty or freedom of locomotion; it may be caused by actual force, or by fear of force, or even by words").

Taking Jackson's allegations as true, the Officers arrested him (at a minimum) when they grabbed his hoodie and attempted to handcuff him given that these actions far exceeded a mere investigatory stop. The question then becomes whether Jackson has alleged sufficient facts to state a plausible claim that the Officers lacked probable cause at this moment. The Court finds that he has done so.

Jackson's complaint alleges that he was standing on the sidewalk with a facial covering that likely would have prevented the Officers from recognizing him and that he was nowhere near a white BMW at the time of his arrest. The Officers nonetheless approached him based on a vague claim that he was involved in a traffic incident two nights prior, without providing any details on the matter. And despite the Officers' seeming confidence that they had tracked down the person from the prior traffic incident, the Officers asked to see Jackson's identification—suggesting either they were not sure of the identity of the person standing in front of them or doubted whether he matched the suspect spotted driving the wrong way down a one-way street. Yet this uncertainty did not stop the Officers from slapping handcuffs around Jackson's wrists mere seconds after exiting their cruiser. As it would turn out, they appear to have apprehended the wrong man: Jackson claims to have no connection to any white BMW, and his GPS monitoring device places him far away from the scene of the earlier traffic violation. The Officers had more than sufficient time to unearth these exonerating facts but, despite the absence of any exigent circumstances, appear to have not performed basic investigatory steps before arresting Jackson. See Bell v. Neukirch, 979 F.3d 594, 603 (8th Cir. 2020) (holding that "while

officers need not conduct a 'mini-trial' before making an arrest," the Fourth Amendment requires that officers perform "a reasonably thorough investigation prior to arresting a suspect . . . in the absence of exigent circumstances" (citation omitted)).  All these alleged facts cast doubt on the Officers' justification for arresting Jackson that April evening.

Of course, Jackson does not know the exact details leading up to his arrest.  Perhaps the Officers believed they had spotted Jackson driving the white BMW or heard from a source that he was the one in the car and went out searching for him.  If this is how things went down, their failure to search his GPS monitoring device during the intervening two days undercuts their assertions of probable cause.[2]  See, e.g., Liser v. Smith, 254 F. Supp. 2d 89, 97 (D.D.C. 2003) ("[W]hile an objectively reasonable mistake of fact can legally support a determination of probable cause, a mistake that is the product of the government's willful ignorance, investigative negligence, or is otherwise unreasonable, cannot.").[3]  Or perhaps, while patrolling the area, the Officers believed that the man standing outside of the Park Morton Apartments resembled the

---

[2]  If it turns out that the Officers merely mistook Jackson for the person from the traffic incident when spotting him on the sidewalk, they cannot be faulted for failing to search his monitoring device because, under this fact pattern, they would not have known his identity let alone that he was on parole.  The Court cannot assume this version of the facts, however, as discovery is needed to uncover what exactly transpired that day.  And regardless, as discussed below, this fact pattern raises its own vexing question of why the Officers did not perform any further inquiry on the scene before handcuffing Jackson.

[3]  At the same time, courts in this District have found that failure to investigate further and uncover exonerating facts does not undermine what is otherwise a sufficient quantum of evidence to support probable cause.  See, e.g., Black v. District of Columbia, 466 F. Supp. 2d 177, 180 (D.D.C. 2006) ("[F]ailure to investigate a suspect's alibi does not belie probable cause.").  The best way to square this potentially conflicting caselaw is that an officer generally must investigate further when the existing evidence in her possession is such that a reasonable officer would take additional investigatory steps.  See, e.g., Hall, 867 F.3d at 154.  Again, the Court does not know what additional facts the Officers had in their possession that may have led them to believe that they could rest their case and make the arrest.  But it would be improper at this stage to assume that the Officers must have had sufficient evidence to excuse them from being more thorough in their investigation.

person they had seen two days prior.  If this is how the events transpired, the Officers were perhaps overconfident in their ability to discern Jackson's identity from behind his facial covering and should have performed a further inquiry on the scene before reaching for the handcuffs.  A less benign option, which the Court takes up below, is that the Officers did not make a mere mistake but rather that Jackson was the victim of an unconstitutional "jump-out" in which MPD officers search and seize individuals in predominantly Black, low-income areas without probable cause—a blatant violation of the Fourth Amendment.  Jackson does not know for certain which of these possible narratives (if any) is the correct one.  But he need not know what exactly occurred at the pleading stage; that is what discovery is for.  All Jackson must do at this stage is allege sufficient facts to support a plausible inference that the Officers lacked probable cause.  The confluence of facts alleged in the complaint reaches beyond establishing the mere possibility of unlawful action to plausibly state a claim on which relief can be granted.  That is enough for Jackson to satisfy his burden.

Defendants attempt to escape this reality via two routes, but both are dead ends.  They first contend that, even if further inquiry would have revealed that Jackson was not the individual from the prior incident, "an officer faced with conflicting information may find probable cause and need not conduct a mini-trial before effectuating an arrest."  Officers' Mot. Dismiss at 5 (citing Dukore v. District of Columbia, 799 F.3d 1137, 1143 (D.C. Cir. 2015)).  While this is certainly true as a matter of law, it is unavailing based on the facts alleged here.  The complaint contains no conflicting facts that might have led a reasonable officer to find probable cause, and it would be inappropriate for the Court to color in the details of the limited record by drawing up some valid reason for believing that Jackson was the individual from the prior traffic incident.  And a mere inspection of GPS monitoring records during the intervening two days or inquiry

into Jackson's identity once on the scene is far from the sort of mini-trial that the Circuit held was unnecessary in Dukore.  It instead resembles the sort of reasonable inquiry that officers must perform absent exigent circumstances before seizing a suspect.  See Bell, 979 F.3d at 603; Hall, 867 F.3d at 154 (holding that officers lacked probable cause when they violated their duty to perform a reasonable investigation).

Defendants next attempt to fast forward to the moment Jackson resisted arrest when he tensed up, pulled away, and brought his hands toward his body because he "did not want to be handcuffed and did not understand why he was being treated this way."  Compl. ¶ 35.  They then note that Jackson was charged with "fleeing a law enforcement officer" and "resisting arrest," id. ¶ 49, and maintain that the Officers undoubtedly had probable cause to believe that Jackson committed the latter offense, see Officers' Mot. Dismiss at 5.  Defendants thereby contend that, based on Jackson's own admissions, the Officers must have had probable cause to take Jackson into custody based on his resistance.  But as Jackson rightly notes, "[w]hat Defendants fail to recognize is, at that point, Defendant Officers had already arrested Plaintiff."  Opp'n to District's Mot. Dismiss at 3.  After all, this second crime was for resisting arrest—a crime that obviously assumes that Jackson was already under arrest at that moment.  Defendants thus cannot escape liability for false arrest with the topsy-turvy theory that Jackson resisted their (allegedly) false arrest and that such resistance retrospectively justified seizing him.

## 2. Qualified Immunity

Regardless of whether Jackson makes out a plausible claim of false arrest, the Officers nonetheless contend they are entitled to qualified immunity.  See Officers' Mot. Dismiss at 6–7.  The Court is cognizant that "the validity of a qualified immunity defense should be determined as early as possible, preferably before discovery and trial."  Kalka v. Hawk, 215 F.3d 90, 94

11

(D.C. Cir. 2000).  But this general guidance has its limits, and it is too early in the day here to make this call.

While it may prove to be true that any error the Officers made was reasonable and they should be shielded from liability, nothing in the current record supports this supposition.  If it turns out the Officers clearly lacked probable cause because they failed to perform a rudimentary investigation and opted to arrest Jackson based on flimsy or non-existent evidence, the Officers would have violated clearly established law.  See, e.g., Hall, 867 F.3d at 155–56.  The Court thus must reject the invocation of qualified immunity for the time being, but the Officers are certainly free to raise this defense anew once the facts come into greater focus and the Court has a clearer image of the lead up to Jackson's arrest.

### B.  Count 5: Negligent Supervision

The District next moves to dismiss Jackson's claim of negligent supervision.  To make out a claim of negligent supervision, a party must "show that an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee."  Katz v. District of Columbia, 285 A.3d 1289, 1317 (D.C. 2022) (quoting Giles v. Shell Oil Corp., 487 A.2d 610, 613 (D.C. 1985)).  The District can be held liable for negligent supervision if it is "negligent or reckless . . . in giving improper or ambiguous orders [or] in failing to make proper regulations; or. . . in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control."  District of Columbia v. Tulin, 994 A.2d 788, 795 (D.C. 2010) (citation omitted).  Although it is a somewhat close call, Jackson has alleged just enough to squeak by the District's motion to dismiss and get to discovery on this count.

Jackson's negligent supervision claim is premised on his allegation that MPD failed to take appropriate action to counteract the unconstitutional practice of "jump-outs."  To make out this claim, Jackson must plausibly allege that (1) he was the victim of a jump-out and (2) the District was aware of this practice but failed to take appropriate action to prevent it.  On the first prong, Jackson's complaint cites to Seargeant Djossou's ongoing Whistleblower Act lawsuit in which Djossou contends that MPD units have employed the unlawful practice of driving through low-income, predominately Black neighborhoods and jumping out of their vehicles to seize and search individuals without probable cause—oftentimes in the hopes of turning up weapons.  See Compl. ¶¶ 3–4 & n.4 (citing Djossou v. District Of Columbia, 2020-CA-004292-B (D.C. Sup. Ct.).  Jackson contends his purported mistreatment fits this bill.  Jackson, who is Black, alleges that he was standing with a group outside of a low-income housing unit when Officers Green and Ishakwue hopped out of their cruiser and immediately attempted to search his hoodie and detain him without justification.  On the second score, Jackson notes that Seargeant Djossou had alerted higher ups that certain units were employing jump-outs as a standard police tactic back in 2015. See Compl. ¶ 4 n.4.  But rather than root out the issue, Djossou (and, in turn, Jackson) maintains that the top brass turned a blind eye.  Former MPD Chief Robert Contee testified in 2022 that he did not investigate Djossou's complaints and agreed that MPD officers "could be doing a jump-out right now and we may not know that."  Id. ¶ 6.  Stitching the two sets of allegations together, Jackson contends that MPD was on notice that officers were engaging in "jump-outs" but failed to tamp down the practice and that this failure to supervise led to his false arrest.

The District's motion to dismiss pulls at the second thread.  Even if MPD was aware of a general problem with jump-outs, the District points out that Jackson's complaint "fails to allege any specific facts about the District's actual or constructive knowledge of previous dangerous or

incompetent behavior *exhibited by Defendant Officers Green and Ishakwue*."  District's Mot. Dismiss at 6 (emphasis added).  But a plaintiff need not demonstrate that the District had knowledge that *particular* officers engaged in misconduct if it was aware of a *systemic* issue within the police department.  A plaintiff instead may meet his burden on this count by showing that the alleged misconduct "occurred with such regularity that the District was on notice of some common propensity among MPD officers."  Spiller v. District of Columbia, 302 F. Supp. 3d 240, 255 (D.D.C. 2018); see also, e.g., James v. District of Columbia, 869 F. Supp. 2d 119, 121 (D.D.C. 2012) (finding a plaintiff adequately stated a claim of negligent supervision based on systemic issues within MPD).  Jackson has alleged that MPD was aware of a systemic issue with jump-outs within its ranks but buried its head in the sand.  If this proves true, it will matter little whether MPD leadership was on notice that Officers Green and Ishakwue ever personally partook in this tactic.

   With that said, while Defendants do not address the issue, the Court has some doubts as to whether Jackson satisfied the first requirement by showing that his arrest properly falls under the "jump-out" banner.  According to the materials incorporated by reference in the complaint, jump-outs are most associated with the Gun Recovery Unit ("GRU") in MPD's Narcotics and Special Investigations Division.  See Jordan Crunkelton et al., End Jump-Outs, D.C. Just. Lab (Sept. 2020), https://dcjusticelab.org/wp-content/uploads/2022/04/EndJump-outs.pdf.  The GRU's "[s]pecialized paramilitary units" are claimed to convoy through poor neighborhoods, jumping out of oftentimes unmarked vehicles to stop and search individuals without cause in an effort to uncover and confiscate firearms.  Id. at 1.[4]  From the facts alleged, it is not at all clear

---

[4]  This Court is well familiar with the GRU's historical tactics.  See Lane v. District of Columbia, 104 F. Supp. 3d 7 (D.D.C. 2015), aff'd, 887 F.3d 480 (D.C. Cir. 2018).

that Jackson's arrest lines up with this purported practice.  Jackson does not claim that Officers Green and Ishakwue are members of the GRU, nor does he claim that the Officers attempted to seize and search any of his friends on the scene.  This more targeted, full-on custodial arrest of Jackson appears markedly different from the brief seizure and search for weapons typical of jump-outs.  Thus, even if MPD promoted or failed to prevent jump-outs, it is uncertain whether that negligence would carry over to Jackson's case.  At the same time, Jackson does allege the MPD Officers attempted to search his hoodie before arresting him, see Compl. ¶¶ 25–26, and that a large squad of officers quickly descended upon what appears to be a relatively routine stop involving a traffic incident, see id. ¶¶ 39–48.  These puzzling facts bring this case somewhat closer to the usual jump-out in which groups of caravanning officers pop out of patrol cars and immediately direct individuals to show their waistbands.  See Crunkelton et al., supra at 1. Additionally, Sergeant Djossou's lawsuit has shown that the phrase "jump-out" is a capacious (if ill-defined) concept rather than a precise term of art.  It is thus possible that this practice has spilled out beyond GRU's tactics to sweep up firearms and could reach the alleged incident here. But the term's imprecision may create its own set of headaches for Jackson, as a concept that sweeps within its ambit every time an officer exits her vehicle and seizes a person without probable cause may prove too nebulous a basis on which to stake a claim of negligent supervision.

The District does not bring up these thorny issues in its motion, however, and the Court need not resolve them right now.  After all, a "plaintiff's burden at the pleading stage is minimal."  James, 869 F. Supp. 2d at 121 (cleaned up).  The allegations in the complaint satisfy that light burden, especially considering the District's failure to address what are likely the

loosest links in Jackson's logic.  The District is free to explore the potential issues identified above in any subsequent motion for summary judgment.

C.  <u>Counts 6 and 8: Negligence and Negligent Infliction of Emotional Distress</u>

Defendants also have moved to dismiss Jackson's common law negligence (Count 6) and negligent infliction of emotional distress (Count 8) claims against the MPD Officers (and against the District under *respondeat superior*).  As alleged in the complaint and as Jackson reiterated in his oppositions, both of these claims turn on the Officers' alleged negligence in arresting Jackson without probable cause.  So stated, these negligence claims fail under D.C. law because they are not "separate and distinct" from Jackson's intentional false arrest claims.  <u>District of Columbia v. Chinn</u>, 839 A.2d 701, 707 (D.C. 2003).

Although "one incident may give rise to claims of intentional tort [and] negligence," a plaintiff pursuing both sets of claims under D.C. law must set forth separate and distinct theories of liability for the two counts.  <u>Sabir v. District of Columbia</u>, 755 A.2d 449, 452 (D.C. 2000).  In cases involving alleged police misconduct, this "separate and distinct" requirement demands that the negligence cause of action be (1) "distinctly pled," (2) "based upon at least one factual scenario that presents an aspect of negligence apart from" the officer's purported intentional tort, and (3) "violative of a distinct standard of care."  <u>Blair v. District of Columbia</u>, 190 A.3d 212, 224 (D.C. 2018).  Jackson clearly satisfies the first requirement because his complaint distinctly pleads two negligence counts in the alternative to his intentional tort claims.  <u>See</u> Compl. ¶¶ 115–23, 129–33.  The snag here is that his negligence claims fail to satisfy the second and third requirements because he does not meaningfully distinguish these "alternative" claims from their intentional-tort counterparts.  In fact, the D.C. Court of Appeals on multiple occasions has rejected attempts to plead negligent arrest in the alternative to false arrest on the ground that the

two claims are "indistinguishable," both turning on an alleged lack of probable cause.  See Katz, 285 A.3d at 1317; Stewart-Veal v. District of Columbia, 896 A.2d 232, 235 (D.C. 2006).  Courts in this District have followed suit and rebuffed attempts to bring false arrest and negligent arrest claims in tandem.  See Kenley v. District of Columbia, 83 F. Supp. 3d 20, 47 (D.D.C. 2015); Bethel v. Rodriguez, No. 20-cv-1940 (RC), 2023 WL 6388851, at *13 n.18 (D.D.C. Sept. 30, 2023).

        As currently alleged, the Court must follow this standard practice and dismiss the two negligence claims here.  In describing both claims, Jackson maintains "that Defendant Officers failed to act as reasonably prudent police officers by detaining Plaintiff with no probable cause." Opp'n to District's Mot. Dismiss at 4; see id. at 6 ("Plaintiff alleges that it was the Defendant Officers' negligence in failing to properly investigate the existence of probable cause for the arrest that forms the basis for his NIED claim, not any intentional act."); Opp'n to Officers' Mot. Dismiss at 9 ("Plaintiff alleges that Defendant Officers failed to act as reasonably prudent police officers by detaining Plaintiff with no probable cause.").  As was true in the cases cited above, these allegations are not distinct from the false arrest claims because both turn on whether the Officers arrested Jackson without probable cause.  Without a clear independent basis for these negligence actions, the court must dismiss these claims pursuant to D.C. law.

        The dismissal will be without prejudice, however, as Jackson may be able to cure these deficiencies by pointing to some separate legal duty that the Officers violated beyond the duty to establish probable cause before making an arrest.  For example, Jackson claims the Officers "neglected to conduct even the most basic investigatory steps" such as checking his monitoring device, verifying his car ownership, or even informing him of the basis of his arrest before taking him into custody.  Compl. ¶ 131.  If Jackson can point to some D.C. law or regulation requiring

officers to follow these (or other) investigatory practices, it may prove possible to decouple his negligence and intentional tort claims. On a similar note, portions of the complaint addressing negligence touch on his alleged mistreatment once handcuffed. See id. ¶¶ 121, 131. D.C. caselaw shows that such allegations can form a valid negligence claim if based on a supposed violation of D.C. law or departmental regulations rather than representing merely an intentional assault or standard Fourth Amendment excessive-force violation. See Chinn, 839 A.2d at 707–11. Accordingly, the Court will give Jackson another opportunity to disentangle his negligence and intentional tort theories should he choose to do so by amending his complaint.

D.  Count 7: Fifth Amendment

Finally, Defendants have moved to dismiss Jackson's Fifth Amendment substantive due process claim. The complaint contends that, "[i]n the alternative to a finding of liability under the Fourth Amendment, Defendant Officers are jointly and severally liable for treating Mr. Jackson with deliberate indifference that shocks the conscience and invokes the very notion of an 'arbitrary exercise of governmental power.'" Compl. ¶ 125 (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)). The problem with this allegation is that it should be brought under the Fourth Amendment, not the Fifth Amendment, and thus must be dismissed.

"Where a Section 1983 claim alleging police misconduct 'arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, . . . rather than under a 'substantive due process' approach [of the Fifth Amendment].'" Matthews v. District of Columbia, 730 F. Supp. 2d 33, 36 (D.D.C. 2010) (quoting Graham v. Connor, 490 U.S. 386, 394 (1989)). The Fifth Amendment claim here violates this rule because it is entirely based on Jackson's arrest and therefore cannot proceed. To the extent this due process claim reiterates Jackson's challenge to the Officers arresting him

absent probable cause, it merges with his Fourth Amendment false arrest claim and need not be restated.  See Harvey v. Kasco, 109 F. Supp. 3d 173, 177–78 (D.D.C. 2015); Turpin v. Ray, 613 F. Supp. 3d 186, 197 (D.D.C. 2020).  And to the extent this claim reaches beyond his current false arrest claim to challenge the manner in which the Officers executed his arrest rather than their justification underlying it, this challenge to the reasonableness of an officer's conduct during an arrest must be brought under the constitutional clause directly addressing this matter: the Fourth Amendment.  See, e.g., Matthews, 730 F. Supp. 2d at 36; United States v. Fowlkes, 804 F.3d 954, 963 (9th Cir. 2015) (noting Fourth Amendment claims can challenge the "manner" and "scope" of an arrest in addition to "the justification for initiating it").

Accordingly, the Court will dismiss Jackson's Fifth Amendment claim with prejudice but afford Jackson an opportunity to re-allege his challenge to the Officers' conduct during his arrest under the Fourth Amendment.

## IV.   Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that [Dkt. No. 10] the District of Columbia's Motion to Dismiss is GRANTED in part and DENIED in part; and it is further

**ORDERED** that [Dkt. No. 21] the MPD Officers' Motion to Dismiss is GRANTED in part and DENIED in part; and it is further

**ORDERED** that Jackson, if he so chooses, shall file an amended complaint addressing the identified deficiencies with Counts 6, 7, and 8 within 30 days.

**SO ORDERED**.

 

 

 

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>November 1, 2023</u>